Your Honor, Carl Gunn. I represent Mr. Door. How are you, Mr. Gunn? Long ways from home. I am, Your Honor, though actually this is my home six months of the year. Oh, well. Not this time of year, which is sort of cheating, I'm afraid. But, Your Honors, I'm going to try to reserve three minutes for rebuttal. And I do want to make sure I have some time to address the Miranda and search issues. But I wanted to first make completely clear the multiple hurdles the government has on the ACCA issue. Even if you let the government. On the ACCA? ACCA, Armed Career Criminal Act. Right. Even if you let the government reverse course again and go back to the modified categorical approach, and even if Mathis gets decided in the government's favor, which would go against the majority of the circuits, the burglary convictions can't be counted. And there's at least two reasons that's the case. The first reason is that the statute here, the Washington burglary statute, isn't a finite list that DECAMS requires. The definition, which I quote at 36 of opening brief, just, quote, includes, unquote, the things in the list. And under Washington law, the word, quote, includes, unquote, quote, denotes a non-exclusive exemplary listing, unquote. That's in the State v. Hall case I cite in the brief. Second, Your Honors, the definition has a catch-all phrase at the end of, quote, any other structure, unquote. And the state courts give that independent force. I cite the State v. Ganz case in my brief where it gives that independent force. So even if Rendon gets overruled, you don't have the finite list of alternatives. You basically have the DECAMS example of any other weapon preceded by some examples. So that precludes a categorical approach. It's a modified categorical approach. Why is that? Because, Your Honor, Why can't we then look and see what he was actually, what your client was actually convicted of? Because under DECAMS, all you can do is use it. You need a divisible statute, which can't be something that says any other, any weapon. And when you, I don't think you get around that by having a list and then adding any other weapon, which is essentially what the statute here does. It was addressed specifically by the 11th Circuit in the United States v. Howard case that I cite. And I think that's a very well-reasoned decision. There's also a second reason. I'm sorry. What does Rendon do in this context? Well, what Rendon does is you can't get to the modified categorical approach. The only way you can even look at a modified categorical approach is, first, if you let the government change its mind about what it's arguing, and, second, if Mathis overrules Rendon. So, but there's a second reason here, Your Honor, if you get to the modified categorical approach that you couldn't find, and that's the court documents here. What DesCamps says you use the court documents for is to determine which statutory phrase the defendant was charged and convicted under. You don't have that here. None of the informations in this case in the court records, which are in the excerpt, choose between enters unlawfully or remains unlawfully. It lists both in all the informations. Neither do any of the informations choose one of the possible things in the statutory list of building. The only statutory term they have is building. So you don't have this selection of a statutory phrase. Now, you do have in the informations a description of the building with an address, and either in one case, quote, auto body shop, unquote, or in another case, quote, residence, unquote. But those aren't one of the statutory phrases that's being selected the way DesCamps talks about. There's nothing in the statute about a, quote, residence, unquote, or a, quote, auto body shop, unquote. And, frankly, each of those things could very easily include a fenced area, which under the winner case and under the- The auto body shop could. Correct. Residence is harder to come up with unless you include park benches as a residence. Well, actually, Your Honor, to me, my residence includes both my physical building house and my front yard that's fenced in. To me, that's all my residence, and it all, of course, has the same address. So I think residence could include- Well, that's a curtilage, isn't it? The front yard becomes part of the curtilage. I mean, the fact that some pieces of property also include open space is not going to defeat- I mean, because it's hard to think of any piece of property, an office building, a residence, a home, an apartment building, that doesn't include some small area of open space. So the fact that the description includes some open space is not going to be a winner for you. Oh, I think it is, Your Honor, because the question here is whether it's narrowed by the charging document. First of all, the question is whether- Now, you and I are now getting into a fight about what residence means and includes. And, of course, the question under discamps is what a jury and or court found. And the reason we have an exception to apprendi is because we aren't going to get into a fact-finding dispute about what people are thinking of. So I think that's why all you use the court documents to- I don't think so. I think your argument is because part of the residence includes open space, the residence- I mean, the auto body shop could be a grand jury. You could have an auto body shop that's entirely outside that has, you know, uncovered space. But a residence doesn't necessarily have a building that one can break into. Right. But I think- Even though you might have to cross some open space to get to the building. But I think a person who pled guilty, a person could be found guilty and could plead guilty and have in mind that what I did was I jumped the fence to steal something in the yard. But wouldn't that be included in the generic definition? No. Let me finish the question. I'm sorry. I apologize. By virtue of the fact that all residences have some open space, so the mere fact that you have a yard in front of your house doesn't make it any different than your generic house. Most houses have a residence. So if the generic definition excludes everything that has a front yard, then the generic definition becomes very narrow because I know very few houses that have no- Except the generic definition is a building, not a house or a residence. The generic definition is a building. So you are excluding from the generic definition for federal law purposes every single family dwelling in America? No. No. Every single family dwelling with a front yard in America. If the statute- With a fenced backyard in America. No. If the statute and information said house, everything would be fine because I don't think house includes the yard around it. But residence certainly could. But the other problem here is what Discamp says you do, precisely so we don't get into this argument interpreting what the defendant admitted and what the court found, Discamp says all you use the court records for is to choose which of phrases listed in the statute. So you'd have to have the phrase residence listed in the statute, and it is not here. So that's your problem number one. I think the reason Discamp said that is precisely so there's not an argument about what residence means. But that's a different argument than you were making. I mean, you've just sort of shifted tracks on me, which is not really helpful. I mean, if you want to shift tracks and want to say, look, this is my best argument on this, let me give you another argument, that's fine. But on the argument, on the issue we were discussing, your position is that if you are dealing with a house, with a residence that has a front yard, it has to say house. And if it says residence, and the mere possibility that the resident might have a front yard excludes it from the generic definition. My position is it has to say house anyway because the generic definition includes building, and residence is something broader than just the building where house isn't.  Why isn't residence the enclosed portion of a property? I mean, when I think of residence, when I think of sort of my residence, I think of the house part. I don't think about the yard or the portion that sort of goes down the hill. And different people could think of different things. That's why it has to be one of the statutory phrases. If the statute used the word residence. Again, you're shifting. No, no, I don't think I am. Yeah, I think you are. Well. I think you're now saying they have to pick a statutory phrase. No, but I'm explaining why if it was in the statute, we wouldn't have this problem. If it was in the statute, the word residence, then there would be case law interpreting residence and or another statute defining residence, and it would either say it means just the house or the house plus the yard. And then we'd know whether it qualified as a building under the generic definition. If it's not in the statute, it leads to precisely this problem, which is precisely why you can't use a phrase. And I guess I'm mixing the arguments intertwined, though. That's why you can't use a phrase that's not in the statute. I see I'm down to five minutes. I was hoping to talk about the other issues, but I don't know if Your Honor has a question. Well, I was wondering if you want to get to the conviction issue. The search? The search issue, yes. And there is the Miranda issue, too, and I do have a very strong argument that it's not harmless error. But let me talk about the search issue. You have a very nice, if I can use that word, set of cases that show you both sides of the spectrum and, in a way, the middle. On the side of what's insufficient, you have this Court's Morales case and the Supreme Court's J.L. case. On the side of what's sufficient, albeit just barely, you have the Supreme Court's White and Navarrete cases. I say just barely because the Supreme Court itself called those closed cases. And then you have several Ninth Circuit cases that are basically like Navarrete and or, I guess, mostly like Navarrete as opposed to White. Those cases all have much more than we have here, Your Honor. In White, you had this very detailed prediction of hard-to-predict activity that then the officers actually observed. In Navarrete, you had a combination of four different things. You had knowledge of the informant based on actually seeing the activity. You had reports being made almost immediately after the events. You had ongoing dangerous activity, and you had the 911 system being used. On one of the Ninth Circuit cases, you had a Department of Transportation employee referring it through his dispatcher. This case had nothing like that. There's only one instance where the informant claimed to have actually seen Mr. Doar with a gun, and he was looking down a driveway at night, so even on the face of it, you wouldn't think he could be sure. It was not something that had just happened. The agent, in context, thought it was, quote, recently, unquote, but on cross-examination, he admitted all that meant was sometime within the last year. You have no 911 call. You have no prediction of hard-to-predict activity here, just Mr. Doar's residence and cars. You have no 911 call with a person who just happened not to give his name, which is the context of all the other cases.  His name is Joe. No, no, I'm sorry. That's correct. He gave the first name of Joe, which is one of the more common names around, and he specifically did not want to identify himself further. He specifically said, I want to be anonymous. In contrast to 911 calls, at least in these cases, where someone just made the call and didn't happen to get asked their name. In fact, in one of the Ninth Circuit cases, the person gave a name. They just talk about how they couldn't then track him down with a name. Counsel, when we look at the question of whether there's reasonable cause to make a probation search, as I understand it, the Supreme Court says we look at the total circumstances. It depends a little bit on what the state statute and condition is, but the Washington state statute and condition is reasonable cause, which the courts have said is the same as the reasonable suspicion standard. So it's your regular reasonable suspicion standard. But the standard does require us to look at total circumstances. Correct. I wanted to get your answer affirmatively on that, and then I have a more general inquiry. When you look at what is a reasonable circumstance, a reasonable cause, to make a probation search and the total circumstances, to what extent can you look at the attributes of the person to be searched, like what they've been convicted of before? I guess it would depend, Your Honor, but not very much, because here the reasonable cause or suspicion you need under Washington law, the Jardinus case I cite, is reasonable suspicion that there will be evidence of a probation violation found. So there'd be a probation violation found if there were guns in his car? Yes. So if he's been convicted of several offenses involving use of guns, shooting at police officers or something else, is that part of the calculation? I think here it's, in this case, it's very de minimis, Your Honor, because there's actually only one conviction with respect to guns, and that was, I think, 10 or 11 years earlier. The conviction was actually not for shooting at police officers, at least knowingly. The conviction, he was convicted of a lesser-included offense. But I think the answer is, when it's 10 or 11 years old, Your Honor, it's pretty de minimis, I would submit. Okay, thank you. I was going to try to save a couple minutes for rebuttal. I see I just ran out. I don't know if there's any other questions the Court wants me to address before I sit down. We'll hear from the government. Thank you. Good morning, Your Honors. May it please the Court. Michael Morgan for the United States. Taking things a little bit backwards, with respect to the sentencing issues, especially the modified categorical approach that may or may not apply, depending on what the Supreme Court does in Mathis, the government's a little hamstrung at this point because we haven't briefed that issue because at the time we filed our brief, cert hadn't been granted in Mathis, and so we just briefed the case under Rendon. So there's been a very long discussion about how the modified categorical approach applies, doesn't apply, and the government hasn't briefed it. And I think that depending on what the Supreme Court does in Mathis, the most prudent course would be, assuming that Mathis goes the government's way and they affirm the Eighth Circuit, it would be to order supplemental briefing in light of Mathis to really resolve these questions. Yes, Counselor. Assuming that we decide that we're not going to overturn the conviction based on the cert or Miranda issues and we're just looking at sentencing, would you ask us to defer for Mathis, defer decision? Yes, I would. And let you do supplemental briefing, which of course you can't do until Mathis has been decided. That's correct, Your Honor. I mean, assuming the Court's not prepared to affirm the convictions, just the issues of judicial economy really counsel waiting, I mean, for a couple of reasons. One, if the Court was to decide the sentencing issue today, you'd have to decide it under Rendon, under the Rendon analysis, which the government concedes that while the government has an argument that under Rendon we actually win, if the Supreme Court disagrees with the methodological analysis there, then assuming that if you bought our argument, then the defendant would be coming in asking the Court to recall the mandate after Mathis is decided. Conversely, if you don't buy the government's argument and you were to apply Rendon and say, no, these convictions don't count, and the Supreme Court disagrees with Rendon and Mathis, then the government would be coming in asking you to recall the mandate. Or if you weren't inclined to do that, then the district court would just have to apply Mathis on remand and we'd have yet another sentencing appeal. Or we could say even assuming Mathis comes out the other way and overrules Rendon, this is clearly not subject to the categorical approach. I mean, this is subject to the modified categorical approach because we looked at the documents and looked at the statute and the government loses anyway. We could say that, right? You could do that. Which is what Mr. Gunn wants us to do. I understand, Your Honor. And while you could do that, well, one, I don't think you actually could do that because Rendon today is controlling. But if the court were inclined to do that, the government would. . . Would reach the same result, right, as Rendon would? Well, I suppose you would reach the same result, but that would be an odd analysis. But if the court were inclined to sort of assume, like apply Mathis and say the government loses under Mathis, the government would like the opportunity to brief it because we've never. . . I mean, we can't be faulted for filing our brief under the state of the law at the time it existed in this court. That state of the law still exists today, but is admittedly, I think everyone agrees, is in flux and may or may not change. Counsel, would you go back to Rendon? I asked Mr. Gunn the same question. What does Rendon tell us with respect to this issue? With respect to the modified categorical approach, Rendon is pretty clear. You only, for purposes of divisibility, Rendon reads a statute, even if it's listed in the alternative, as not divisible if the statutory alternatives are means and not elements. That's the rigid means-elements distinction that Rendon adopted. And subsequent cases interpreting Rendon have even cavited further, is that you can't go to definitional statutes to try to figure out what a term means. You're stuck with the statute itself. So, for example, in our case, the burglary statute defines or precludes unlawful entry into or remaining in a building. But the term building is defined elsewhere to have a list of options, some of which would satisfy the definition, some of which wouldn't. Now, prior to Rendon, under the way I've always understood the modified categorical approach to apply, in that circumstance you would look at the Shepard documents and see if the person was charged with one of the options that matches. But as this Court held in Simmons and a prior case, as this Court reads Rendon, you don't do that anymore. You can't go to those definitional statutes. You're stuck with the statute of conviction itself. So, therefore, are you agreeing with Mr. Gunn with respect to Rendon, then? Well, I'm agreeing with Mr. Gunn to the extent that Rendon would preclude application of the modified categorical approach in this case. The government believes that if Rendon and the cases interpreting Rendon are taken to their logical conclusion, second-degree burglary is actually categorically a violent felony because the statute of conviction, unlawful entry into or remaining in a building, matches perfectly the generic crime defined in Taylor, unlawful entry into or remaining in a building. So if you apply the logic of Rendon rigorously, as this Court has interpreted subsequently, again, excluding resort to definitional statutes, it's actually now categorically a violent felony. And that's somewhat a counterintuitive result, but it logically follows, because the prior cases saying that the Washington burglary statute is overbroad because its definition of building, we're looking to alternative means of committing the crime. But if you take Rendon seriously, means are irrelevant. What's only relevant is the element, and the element is a building, and that is the exact element that was in Taylor. Even though there may be lots of case law that says houseboat is involving houseboats or trailers or lean-to sheds or something like that, right? Well, that would be akin to Shepard, right, where the Massachusetts statute said house, boat, or vessel. House, boat, or automobile in the same statute. In the same statute, but the other statute just says building. Right. And then you'd have state case law that includes things that are clearly not buildings. Sure. And even here we have a state definition that clearly includes things that are non-buildings. I'm not saying that the government's argument is like an intuitive one. I'm saying it just logically follows that if you take the Court's precedent seriously, that say definitional statutes may not be consulted for purposes of a Rendon analysis because they set forth alternative means, and alternative means have no role to play in this analysis. We are only focused on elements. Then that body of case law that Your Honor is referring to is essentially a dead letter. Now, that's not the approach that was taken in Mathis, and I doubt that's the approach that the Supreme Court will take when it decides Mathis, but I can't be certain about that. Could I ask you another question on sentencing? All the issues about whether the burglaries are a violent felony relate to whether ACCA or Armed Career Criminal Act sentencing applies or not, right? Yes. But now in addition, as I recall, there were some sentencing enhancements for other things like viewing a seal bomb as an explosive device and using the guns in connection with another crime, I guess assuming it was drug dealing. My question is, did the district court make specific findings that would support all those enhancements? And as an example to illustrate, with the seal bomb, my understanding would be it's not normally made to blow up people. If somebody intended to use it that way, if there was a finding of intent, then that enhancement would be correct. But here there wasn't, I don't think. I think, well, I will answer the court's question, but I would take issue with the preceding premise. No. What happened, the parties made their arguments and the court adopted the probation department's calculation. So it did not make an affirmative finding that Mr. Doar intended to use the seal bomb as a weapon. Did it make any affirmative finding that the guns that were found, you know, in his place were used in connection with drug dealing? It made no such finding, although under the guideline that such a finding is not required. What is required is proximity to either drugs or drug paraphernalia. The record shows that the firearms earlier that morning were in the living room with the drug paraphernalia, so that's sufficient to support it as just a factual matter. But the court made no specific findings on these enhancements. After hearing the parties' arguments, the court simply adopted the pre-sentence report and overruled the objections. With respect to the seal bomb, I mean, the government's position is that you actually don't have to weaponize a seal bomb because it's actually, it's a non-lethal weapon akin to the stun grenade that the court in Ruiz said qualifies as a destructive device. There's no requirement in the statute that the weapon be a weapon that has to be directed at people, and that kind of has to be the case, right? Because if you think about the most common weapon enhancement, firearms, well, firearms, we are told, are not designed to be used against people. Shotguns are designed to be used against birds, but they would still qualify as a weapon. So too the seal bomb. This is an explosive device that is capable of... Birds and burglars. Excuse me? Birds and burglars. Well, that may be an off-brand use for a firearm, but we're told that they're not really designed for that purpose. And the same with the seal bomb. The seal bomb is an explosive device designed to incapacitate a sea lion. That same device can easily incapacitate a person. So under the statutory definition and the guidelines definition, it qualifies as a destructive device. Well, so does a steak knife. Well, yes, I mean, it wouldn't qualify as a destructive device, but I would agree that it could be used as a weapon despite the fact that it's designed to be used for cutting meat. As we know from 9-11, even box cutters can be used. Yes, but I think, again, for the destructive... The purpose, if we don't limit it to the main purpose, doesn't that pretty much include everything? Because if you're given enough time, you can use just about everything to kill another human being. I mean, you can take the carafe over there on council table and probably... Never mind. One could use something like that to inflict serious damage on another person. I understand the Court's point, and that's the logic for why dynamite is not normally a destructive device because its main purpose is legitimate, but if it's weaponized, whereas a seal bomb, its main purpose is to be a weapon, albeit not a weapon against people, but there's no requirement in either statute. Just a clarification. I thought it was to make noise, not to hurt seals, but to make enough noise to... Well, it's to stun and disorient them. It's quite a bit of explosive. It's sufficient to disorient... It's like an M-80, isn't it? It's a little more than that, too, but yeah. I mean, it's sufficiently explosive that you have to have an ATF license to even have one. So, you know, we're not talking about a little firecracker here. I see I have two and a half minutes, so unless the Court has any further questions on the sentencing point, I'd like to briefly touch on the legality of the search. The consent issue is fully briefed. I'll quickly just get to the probation search. We're talking reasonable suspicion here, which is a low standard, and what we have here is we have a tip from a not truly anonymous informant. I mean, the informant gave plenty of identifying information. What else did he say besides Joe? Well, he says his name is Joe. He says he lives in Puyallup. He's a truck driver. He gives the full name of his girlfriend. And the testimony was that through the use of the girlfriend and a state law enforcement measure known as the Lariat Program, they would have been able to, if they needed to, identify Joe through his connection to the identified girlfriend. There's also the fact that Joe was referred to the agent through a known informant. So the informant knew who Joe was, and the agent knew who the informant was, so all he had to do was ask the informant. The informant would have been like, it's Joe Jacob. So he was easily identifiable, much more so, I would say, than one of the cases where this court held that a confidential informant was identifiable, which was a USPS driver in a company of 35,000 people would have been identified because he drove a route. Well, boy, if that's identifiable, then so too is Joe. And there's much more of that that corroborates what Joe said. I mean, perhaps most important is that local law enforcement had confidential informants that confirmed the information, that the local CIs were telling the local authorities that Mr. Dorr was dealing drugs and had guns. There was the odd circumstance that when the agent went to surveil Mr. Dorr's house, someone in Mr. Dorr's vehicle followed that agent as he took a circuitous route through the neighborhood. That's very odd behavior. The house was under video surveillance. All the objective information tied back to Mr. Dorr. I mean, he had three vehicles that all tied back to Mr. Dorr. He lived at the address. Probation confirmed that the vehicle Mr. Dorr was driving was the vehicle he had reported to probation. When you add all these things together, especially I like the cross-corroboration between the local informants and the informant who's talking to the federal officials, that's reasonable suspicion. Reasonable suspicion that there's either going to be guns or drugs there, and that search is authorized by the probation condition. And your bottom line on the confession issue? The bottom line on the confession issue is, well, we believe it's been waived, but if your court doesn't think it's waived, it's completely harmless. Exhibit 301A puts the lie to any, which is one of the audio recordings, puts the lie to any idea that there's any innocent interpretation to his recorded jail call. That's the one where he says, I had two guns, I had two bulletproof vests, so what? But then in the next statement, which is not in the briefs but it's in the recording, he goes on to admit that he had the guns, that he had them hidden in his stove, and he was surprised that the probation officers didn't find them when they had searched earlier. So he flat-out admits that he had the guns. The recording, the full recording is in the record? It is. It's been supplied to the court. And the full recording was played for the jury repeatedly. So the jury heard that full recording many times, including in closing argument. So there is simply no way in the world that that recording has any innocent explanation. So he confessed on tape to the crime. So any, and all of, and every, the other thing I would want to point out is that every piece of information in the written confession is corroborated in all the jail calls. The one jail call he admits, another jail call, it's 301C, he admits to having been home when the agents were knocking at his door and not answering, which is the other incriminating piece of evidence that's also in the statement. So, again, the recorded calls are what convicted him, not his statement to the officers. Thank you. Thank you, Your Honor. Mr. Gunn, you are out of time. We'll give you a two-minute rebuttal. I'll try to stick it on the two minutes. Quickly, on the reasonable suspicion issue, a response. I think the key here is that the informant affirmatively said he wanted to be anonymous and he hoped and thought he'd be anonymous. That's really what goes to the question of whether a person might be making something up. Because I think the question is whether the person thinks he can get away with making something up. And I think that goes to whether he thought he was anonymous as opposed to whether he really was. Supposing counsel points out this was not a cold call, this was somebody who knew somebody. Right. So you can't hardly be completely anonymous when you have an intermediary who knows your identity. But he thought by saying he wanted to be anonymous, he was hoping and thought he could be. That's what I suggest, Your Honor. It's certainly not like the UPS driver who drove up and personally presented himself to the agents and gave the information and they just happened not to get his name. On the other issues, you know, this corroboration by the local detective, it was, quote, word on the street, unquote. There's nothing in the record about whether he even got that from confidential informants, what kind of people those confidential informants were, whether he'd used them before. That would be a pretty good word on the street, huh? Makes you sort of trust the street. Well, actually, they never found any drugs, so it's arguably debatable whether Mr. Doar was selling drugs, which was part of it. On the Miranda issue, remember the test here is whether it's harmless beyond a reasonable doubt. He didn't say, I had two guns. He said, two guns and bulletproof vests, big deal. That could be referring to the charges. But what about the rest of the recording? The rest of the recording says, in a way, it could be harmful, looked at one way, but then you're hiding guns and bulletproof vests under stove burners? There's something, that doesn't sound very feasible or plausible, so I think a defense attorney could make something out of that. Granted, it's an uphill battle, but the test is whether it's harmless beyond a reasonable doubt, whether a defense attorney couldn't do anything with that. It's very different then to a law enforcement agent who you're going to now have to call a liar, yeah, the guns were mine, yeah, the bulletproof vests were mine, et cetera. More than uphill, sounds more like K2, you know. Well, people get up K2, Your Honor, but I'd actually say it's more Mount Rainier, Your Honor, and lots of people climb Mount Rainier with very little training. Last quick point on the idea that Rendon doesn't let you look to state statutes. I started to say a word that was too strong, but there's just no way that's – Rendon says you don't look at state statutes to determine divisibility. Rendon doesn't say you don't look at state statutes to find out what the word in the state statute means or look to case laws. Your Honor was saying, how else would you know what Washington means by building? How else would you know what Washington means by enters or remains unlawfully? And by the way, if you're going to get technical about the words matching, they don't match exactly. The Washington building matches exactly, but the Washington statute says entering or remaining unlawfully, and Taylor says unlawful or unprivileged entry into or remaining in. Those are actually not the exact same words. They're very similar. But, of course, you have to look at case law and statutes to find out what these words mean. You can't just assume building in the Washington statute means the same thing as in Taylor, and you have to look to case law and statutes to do that. Finally, I would fault the government for not briefing the modified categorical approach. It was right there. They knew that Mathis was pending. Mathis was decided two months before and pointed out the split in the circuit. They knew they could choose not to oppose certiorari. I think the government should have briefed those issues because they knew it was in flux. Well, if Mathis does change things, what effect would that have in this case? Well, Your Honor, I think you shouldn't allow the government to reverse course a second time after having tried to take advantage of Rendon affirmatively. If you do let them, then it would ‑‑ if Mathis overrules Rendon, it would eliminate my first of three modified categorical approach arguments. It would not eliminate the two that I brought up in my earlier argument. Thank you. The case is argued. We'll stand submitted. Actually, because we have that issue involving Mathis, we will defer submission until conference because we may decide to hold the case or not. We need to discuss it. So if there is a submit order, it will come after conference or not. So we are deferring submission as of now. Your Honor, can I just bring up one thing not related to the substance of anything? Mr. Doar was concerned about an opinion that might reflect his cooperation or offer to cooperate. I was going to file a motion probably today just asking the court to consider writing the opinion in a way or not publishing it to avoid that being seen. It will be explained in my motion, but I just wanted to flag that. It's not a substantive issue at all. Very well. Just so you can consider it when you decide to have it disposed. We are adjourned.
judges: Kozinski, O'scannlain, Gould